UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

TERRI J. PRICE,

        Plaintiff,

v.                                    Civil Action No. 2:16-cv-1529

REGION 4 PLANNING AND DEVELOPMENT
COUNCIL, and JOHN F. TUGGLE,

        Defendants.


MEMORANDUM OPINION AND ORDER


        Pending are cross motions for summary judgment filed
by the parties on May 5, 2017.  Also pending is the plaintiff's
Supplemental Motion for Summary Judgment, filed December 5,
2018, for which plaintiff's motion to leave was not filed until
January 2, 2019; and to all of which the defendants have
responded, and which will be addressed in a companion order.


I. Background


        The defendant, Region 4 Planning and Development
Council ("Region 4"), is a quasi-governmental agency that
coordinates planning and economic development for the counties

of Fayette, Greenbrier, Nicholas, Pocahontas, and Webster. On December 10, 2001, defendant hired the plaintiff, Terri Price ("Price"), as Fiscal Manager at a salary of $35,000. Defs.' Mot. Summ. J., Ex. A. On July 1, 2006, Price was promoted from Fiscal Manager to Fiscal Manager/Assistant Executive Director. Defs.' Mot. Summ. J., Ex. B. At the time of her discharge on January 30, 2015, Price's salary had increased to more than $85,000. Pl.'s Mot. Summ. J. 1. She was the second highest paid employee at Region 4. Defs.' Mot. Summ. J. 1.

As Fiscal Manager/Assistant Executive Director for Region 4, the plaintiff was responsible for staff leadership, personnel administration, budget preparation, collaboration with the Executive Director, establishing staff priorities and deadlines, accounts payable, regulatory compliance, knowledge of policy and procedure, administration of project-related duties and tasks, management of personnel operations, auditor collaboration, overseeing financial requirements, and leadership. Defs.' Mot. Summ. J., Ex. F. Price's deposition confirms that she administered the payroll, handled employee benefits relating to health, pension and insurance, kept financial records for the agency, and administered Region 4's budget. Defs.' Reply 3, Ex. F at 283-84.

Price claims she was subjected to sexual comments made by former Executive Director of Region 4, W.D. Smith, during her years of employment with the agency. From 2012 to 2014, Price made over 150 secret recordings of conversations that took place in her office. Those recordings reveal that on April 19, 2012, Smith notified Price of a rape that may have occurred in the office and recounted a joke he made to an individual while conversing about the topic, in which he laughingly told that person: "I thought I was the only listed sex offender." Pl.'s Mot. Summ. J., Ex 1. During a private meeting four days later on April 23, 2012, Smith told Price that he was "sitting here looking at you, pretending like you don't have any clothes on, how's that for sexual harassment?" Id. Price responded: "Oh, God." Id. Then Smith complimented Price on her "beautiful eyes." Id. She mumbled "thank you" and changed the subject. Id.

The recordings further evidence that on June 25, 2012, Smith used the phrase that individuals have a "hard on" for their home town because "their town is just as important to them, more important." Id. On June 26, 2012, during a conversation between Price, Smith, and another male employee, Smith jokingly stated: "He's [male employee] got . . . [female employee from Region 1] in a hotel right now" and that this was

her "big fling before she leaves Region 1." Id. Price responded: "He's just nasty this morning," and Smith responded: "I am, I'm a dirty old man this morning, worse than normal." Id. During the same conversation, Smith told a "joke about a man's penis." Id. The three individuals, including Price, laughed at the joke. Id. Lastly, on August 1, 2013, Smith told Price that "all women are" "crazy bitches." Id. These incidents, all attributable to Smith, seem to comprise the sexual comments to which Price was subjected at Region 4.

While working for the defendant, Price never complained of Smith's conduct to the Executive Committee or any other employee at Region 4 until nearly a year after Smith was replaced when on September 8, 2014, her attorney wrote a letter to the Region 4 Chairman that set forth her grievances. See infra pp. 6, 12. Though she claims to have become increasingly concerned about being alone with Smith, she says she feared that retaliation would result from voicing a complaint. Pl.'s Mot. Summ. J., Ex. 2 at 160; 154:10-11.

The plaintiff claims she began recording conversations on her computer in her office after Smith mentioned in January 2010 that he was "ready for his big raise," though she did not begin these recordings until March 2012. Pl.'s Mot. Summ. J., Ex. 2. He planned to retire in three years, in 2013, and a

raise would serve to increase his monthly retirement payments. Pl.'s Mot. Summ. J., Ex. 3 at 27-29. Price testified that she understood this as a request to "effectively 'bury' the increase in the upcoming budget rather than show it as an increase in his salary." Pl.'s Mot. Summ. J. 3, Ex. 2 at 33. According to the plaintiff, she refused his request because she thought it was unethical and unlawful. Id. at 34. Subsequently, Price feared losing her job and her benefits; she claimed to have been "instantly afraid" after he, according to the plaintiff, responded by stating: "Blood's thicker than water" once she denied his request. Defs.' Mot. Summ. J., Ex. D at 87:11-24. Price understood this statement to be "a threat." Id. at 88:1. Smith's longtime support for Price to succeed him indicates that her fear was unwarranted.

Prior to Smith's retirement, he had mentioned to Price that she would be a good replacement for him as Executive Director. Defendants reference an email in contending that Smith "began grooming" Price to succeed him in March 2009. Defs.' Mot. Summ. J. 4, Ex. J. In that email, Price stated that Smith told her she "needed [] to figure out a way [] to start traveling more to attend meetings on these projects and still be able to keep up with [her] current paper work. He [was] needing [her] to learn about the projects for when

[she] becomes Executive Director." Id. She stated: "I know he is correct, but I am just not sure how I am going to be able to do it all." Id.

However, plaintiff claims that, beginning in around March 2012, Smith "refused to allow project calls to be directed to her." Pl.'s Mot. Summ. J. 4, Ex. 1. He apparently "refused to give his contacts Price's phone number, and continued to maintain his R[egion] 4 issued mobile phone." Pl.'s Mot. Summ. J. 4, Ex. 3 at 79, 80-81. In light of this, the plaintiff claims Smith was "actively preventing [her] from making the transition," but that her workload also prevented her from accompanying Smith to meetings and visiting projects. Pl.'s Mot. Summ. J. 4.

Smith announced his retirement to the Executive Committee on March 20, 2013 and recommended that Price replace him. Pl.'s Mot. Summ. J. 4; Defs.' Mot. Summ. J. 4. The Executive Committee approved her appointment as the new Executive Director, effective November 1, 2013. Pl.'s Mot. Summ. J. 4. Plaintiff's appointment was ratified by the Executive Committee on April 17, 2013. Defs.' Mot. Summ. J. 4, Ex. L, at 3. Eleven days later, on April 28, 2013, Price expressed frustrations with her new transitional position in an email to a coworker, stating:

> Now that I have been appointed director, I have more
> of an up hill battle of trying to motivate a burnt out
> staff and trying to do this with a burnt out director
> still messing shit up his last 6 months at work.  I
> have told him, please just go in your office and sit
> for 6 months and we will find him if we need him.  But
> oh no, he insists he is working until his last day.
> Today alone, he cause[d] 3 major screw ups!  If I
> could get my foot in the door someplace else I would
> bail on this whole director position.  So not worth
> the headache.

Defs.' Mot. Summ. J. at Ex. M.  On or just prior to June 18,

2013, Price met with Smith to discuss the proposed budget for

the 2013-2014 fiscal year, which plaintiff was to present to the

Budget committee the following day.  Pl.'s Mot. Summ. J. 4;

Defs.' Mot. Summ. J. 5.  During this conversation, the plaintiff

told Smith she believed Region 4's employee handbook was

"outdated" and a "huge liability" with particular respect to its

overtime policy.  Defs.' Mot. Summ. J. 5, Ex. N.  The following

exchange occurred as follows:

> Smith:    Well, it [Employee Handbook Revision] does
>           need to be done, but let me say this.  Larry
>           Bradford went 13 years living under that
>           risk.  Tim Oxley went 5 years living under
>           that risk.  I went 21 years living under
>           that risk.
>
> Smith:    It's just the way – it's just the way this
>           agency has operated since its inception and
>           never paid a penny of overtime, and never
>           had a comp time policy, and it's improper,
>           but it's how it has operated.  It's not
>           right, but it's worked.  And it's hard to
>           budget and –

```
Price:      Well, I think we're just going to have to do
            like — you know, it's like everything else,
            like the government, whether it's state,
            local, federal.  You're just going to have
            to budget so much, and then it's like, okay,
            once it's done, then it's done.
```

Defs.' Mot. Summ. J., Ex. N at 16.  Price also informed him that

she included $50,000 in the budget to cover either overtime

payments or hiring additional staff to avoid paying overtime.

Pl.'s Mot. Summ. J. 5.  She also included a $15,000 "line-item"

for "contract services" for legal counsel to update the employee

handbook.  Defs.' Mot. Summ. J. 5, Ex. D at 196.

        The Budget committee approved the plaintiff's proposed

budget at the meeting on June 19, 2013, and the Executive

Committee approved it at an Executive Committee meeting later

that evening.  Defs.' Mot. Summ. J. 5.  However, Price claims

the meeting was "highly confrontational" towards her, in that at

least one of the committee members asked her about her salary.

Pl.'s Mot. Summ. J. 5.  She also contends she was "accused" by

Budget committee members "of a serious conflict of interest in

'trying to set her own salary,'" and that Smith did not defend

her "despite being the one who told her what salary to use."

Pl.'s Mot. Summ. J. 5.  The plaintiff makes no citation to the

record in support of these claims.

        By contrast, the defendants claim that at this

meeting, someone asked a question about a "line item" that Price

"had a little trouble answering," which "led to another question or two." Defs.' Mot. Summ. J. 5, Ex. G at 30. Insofar as the Executive Committee meeting was scheduled that same evening to approve the budget, time was "of the essence" and Smith asked the Budget committee to give Price "time to reflect" and answer the question at a later date. Id. at 31. In any case, Mr. Smith testified that ultimately, "everything was in order" with the plaintiff's budget. Id.

Plaintiff claims the Executive Committee "placed numerous restrictions on [her] ascension to Executive Director" inasmuch as she "was required to continue to perform all of her work as Fiscal Manager," "recruit a candidate to replace her, train an accounting assistant, and transition into Smith's role during the final 30 days of his employment." Pl.'s Mot. Summ. J. 5. On July 1, 2013, the plaintiff resigned from her promotion to Executive Director, effective November 1, 2013, and chose to remain Fiscal Manager/Assistant Executive Director. Pl.'s Mot. Summ. J. 6; Defs.' Mot. Summ. J. 7. The Executive Committee accepted plaintiff's resignation on July 8, 2013 and Region 4 hired John Tuggle, effective October 1, 2013, as her replacement.

On October 13, 2013, Price, Smith, and one other employee discussed changes that were soon to take place in light

of Tuggle's new leadership.  Price expressed her concern with
Tuggle's mandate, that all employees work five days per week, as
she typically performed her forty-hour workweek in three or four
days per week on average, and had been working a non-traditional
workweek for a longer period of time than other Region 4
employees.  Pl.'s Mot. Summ. J. Ex. 1.  Smith assured her,
however, that "[i]t's not hurting anybody" and that everyone
will "get paid the same."  **Id.**  He explained that this new
policy made sense, insofar as it would ensure that all staff
were present while Tuggle became acclimated with the agency.
**Id.**  He went on to say: "I think the good part of this is, it's
[the current schedule permitting three to four-day workweeks]
only been in place for three or four months.  It's not like it's
engrained."  **Id.**  He further stated, "I know that you've [Price]
been doing it longer," and that the new policy thus "hurts you
maybe personally more than them, but you're part of the
management team."  **Id.**  The other male employee present added:
"It's technically not fair to people who work more than five
days."  **Id.**  "What if everybody worked a three-day week? What
would we do?"  **Id.**

On January 7, 2014, Price met with Tuggle to ask him
about a "salary range" that she believed he wrongfully
established for her.  Pl.'s Mot. Summ. J., Ex. 1.  The court

notes that the parameters of the "salary range" are not specified. At this point, Price's salary had increased some $50,000 over a thirteen year period – from $35,000 in December 2001, to $85,315 in January 2012 where it remained. Price inquired as to why she apparently exceeded her "range" in light of the fact that other employees received a salary raise while she did not. Id. Tuggle apologized, stating that he "shouldn't have said that," and clarified what he meant by "range" was that, "as of [then]," she "[was] at the end of her range," and for her current position, the salary was appropriate. He stated that, however, after "a year and a half," her salary could be reevaluated for another raise. Id. Price continued to argue with Tuggle about the "range" he allegedly established for her pay.[1] Id.

Eight months later, on September 5, 2014, Price sought medical leave for a "chronic medical condition" and requested that Region 4 provide her with "any forms or documents which need to be completed in order for [her] to request Family and Medical Leave, or any other applicable medical leave, under the Region 4 Planning & Development Council's policies." Defs.'

---

[1] The plaintiff accuses Tuggle of placing a "cap" on her salary throughout her motion for summary judgment. In light of the record, however, this word was never used by Tuggle or anyone else at Region 4. Pl.'s Mot. Summ. J. at Ex. 1.

Mot. Summ. J., Ex. P.  She claimed to be suffering from severe emotional distress due to the alleged "retaliatory actions of Tuggle and R4."  Pl.'s Mot. Summ. J. 7.  It was at this point that Price's attorney, P. Rodney Jackson, who she retained in January 2014, sent the September 8, 2014 letter, which "outlin[ed] Price's complaints and potential claims of sex discrimination, sexual harassment, retaliation, and violation of federal wage and hour law to Mayor John Manchester, the Chair of R[egion] 4's Executive Board [sic, Executive Committee]" and also noted that Price had recorded conversations on her office computer.  Defs.' Resp. to Pl.'s Mot. Summ. J. at Ex. N; Pl.'s Mot. Summ. J. 7-8; Pl.'s Mot. Summ. J. at Ex. 15.

On or before September 18, 2014, Chairman Manchester provided Price with the forms for Family and Medical Act ("FMLA") Leave, which the plaintiff returned completed by her healthcare provider, nurse practitioner Marnie Moose.  Defs.' Mot. Summ. J. 6; Pl.'s Mot. Summ. J. 8, Ex. 9.  However, as the plaintiff admits, the initial versions of these completed forms contained several errors.  Defs.' Mot. Summ. J., Ex. Z.  Pursuant to FMLA regulations, Region 4 requested clarification, and NP Moose added information to the forms.  Defs.' Mot. Summ. J., Ex. D.  Price provided Region 4 with the corrected forms on December 1, 2014.  Defs.' Mot. Summ. J. 6, Ex. R.  Region 4

granted the plaintiff's requested leave from September 8, 2014 to January 5, 2015. Defs.' Mot. Summ. J. 7, Ex. D at 291. Notably, Price claims no employee from Region 4 has ever been required to follow the FMLA certification process, but she offers no evidence to support this. Pl.'s Mot. Summ. J. 8.

This period includes one extension of the leave, as NP Moose estimated in the documentation that Price "might be able to return to work on December 8, 2014." Defs.' Mot. Summ. J. 7, Ex. S; Pl.'s Mot. Summ. J. 8, Ex. 14. Accordingly, Chairman Manchester sent a letter to Price requiring her to return to work on December 8th unless she furnished additional documentation from her healthcare provider approving additional leave. Pl.'s Mot. Summ. J. 8. Price provided the forms and Chairman Manchester granted the additional leave request.

Price claims that Region 4 subjected her to surveillance by a private investigator who allegedly sought to obtain medical records from NP Moose. Pl.'s Mot. Summ. J. 8, Ex. 2 at 146-151; Ex. 14 at 21-24. Price also alleges that Tuggle placed her FMLA forms, which contained personal medical information, in her R[egion]4 personnel/human resources file, but does not point to anywhere in the record to support this contention. Pl.'s Mot. Summ. J. 8-9.

The plaintiff returned to work on January 5, 2015. Pl.'s Mot. Summ. J. 9; Defs.' Mot. Summ. J. 7. Tuggle testified that he wanted to give Price "the chance to come back [after her medical leave] to work to see how that would work out," but that the recordings caused widespread stress at Region 4 and the plaintiff showed "no remorse whatsoever" for making them. Defs.' Mot. Summ. J., Ex. T. 19.

Prior to when the plaintiff returned to work, Region 4 adopted revisions to the employee handbook on December 31, 2014. Pl.'s Mot. Summ. J. 9. The new handbook included a provision prohibiting recordings in the office and the use of "foul language," as well as a provision requiring employees to comply with the FMLA when applying for medical leave. Pl.'s Mot. Summ. J. at 9. Pl.'s Mot. Summ. J. 9, Ex. 2 at 198. On January 12, 2015, Price signed the handbook acknowledgment. Pl.'s Mot. Summ. J. 9. Tuggle then required her to complete a leave "questionnaire" regarding her time records.[2] Pl.'s Mot. Summ. J. 9, Ex. 13.

_____

[2] The form included questions such as: "Would you agree that your failure to accurately report your sick leave used in August of 2006 resulted in you carrying forward a higher balance of unused sick leave than the actual amount accrued?" "Would you agree that your failure to accurately report the use of this annual leave resulted in you carrying forward a higher balance of unused annual leave than you actually accrued?"

On January 26, 2015 Price went to the U.S. Department of Labor, Wage, and Hour Division in Charleston and "notified a representative of R[egion] 4's violations of the FLSA [Fair Labor Standards Act]." Pl.'s Mot. Summ. J. 9. There is no evidence that anyone at Region 4 knew of Price's "notification" to the Department of Labor, Wage, and Hour Division or that the Department of Labor took any action as a result. On January 30, 2015, Tuggle terminated Price's employment due to her "unprofessional, disrespectful and inexcusable behavior in the workplace" in recording office conversations. Defs.' Mot. Summ. J. 8, Ex. U. The discharge form indicated that the recordings reveal Price's "use[] [of] profane language" and her "disparage[ment] [of] individuals at Region 4." Id. It further noted that by recording "an outside professional without his knowledge," Price "planted a seed of distrust of Region 4 which could easily spread throughout the Region and State." Id.

Price filed her seven-count complaint on February 12, 2016, as follows:

Count I: Violation of the Fair Labor Standards Act ("FLSA") and W. Va. Minimum Wage and Maximum Hours Standards Act ("MWMHSA")

Count II: Violation of the W. Va. Wage Payment and Collection Act ("WPCA")

Count III: Retaliation in Violation of the Fair Labor Standards Act ("FLSA") and West Virginia Human Rights Act ("WVHRA")

Count IV: Intentional Infliction of Emotional Distress

Count V: Violation of Proposed Public Policy

Count VI: Sex Discrimination & Sexual Harassment (Hostile Work Environment) in violation of Title VII and WVHRA

Count VII: Malice

This case invokes the court's federal question jurisdiction. The plaintiff seeks judgment as a matter of law on Counts III, V, VI, and VII. In her motion, Price claims the defendants discriminated against her because of her sex, subjected her to a hostile work environment, retaliated against her by terminating her employment, and acted with malice. The defendants move for summary judgment on all counts.

## II. Legal Standard

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those necessary to establish the elements of a party's cause of action. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. <u>Id.</u> The moving party has the burden of showing - "that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial. Fed. R. Civ. P. 56(c); <u>id.</u> at 322-23. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in

favor of the non-movant. **Williams v. Griffin**, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party. **Anderson**, 477 U.S. at 248. Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute. **Overstreet v. Ky. Cent. Life Ins. Co.**, 950 F.2d 931, 937 (4th Cir. 1991).

A court must neither resolve disputed facts nor weigh the evidence, **Russell v. Microdyne Corp.**, 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility. **Sosebee v. Murphy**, 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. **Charbonnages de France v. Smith**, 597 F.2d 406, 414 (4th Cir. 1979). Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." **United States v. Diebold, Inc.**, 369 U.S. 654, 655 (1962).

### III. Discussion

**1. Count I – Violation of the FLSA and W. Va. MWMHSA**

The FLSA states:

> No employer shall employ any of his employees who in
> any workweek is engaged in commerce or in the
> production of goods for commerce, or is employed in an
> enterprise engaged in commerce or in the production of
> goods for commerce, for a workweek longer than forty
> hours unless such employee receives compensation for
> his employment in excess of the hours above specified
> at a rate not less than one and one-half times the
> regular rate at which he is employed.

29 U.S.C. § 207(a)(2). Similarly, West Virginia law prohibits employers from hiring employees "for a workweek longer than forty hours, unless such employee receives compensation for his employment in excess of the hours above specified at a rate of not less than one and one-half times the regular rate at which he is employed." W. Va. Code § 21-5C-3(a).

Under both the FLSA and West Virginia Code, there are exceptions to the general rule. For example, the FLSA provides for an "administrative exception," in which employees whose "primary duty" is "the performance of work directly related to the management or general business operations of the employer or employer's customers." 29 C.F.R. § 541.201; see also 29 U.S.C. § 213(a)(1). And so, an administrative employee who performs work "directly related to assisting with the running or

servicing of the business," including but not limited to tax, finance, accounting, budgeting and auditing, is exempt.  **Id.**

Further, the West Virginia Code deems employees exempt from the state overtime laws who: (1) make at least $455.00 per week on either a salary or fee basis; (2) have a "primary duty" of performing "office or non-manual work directly related to the management or general business operations of the employer or the employer's customers;" and (3) whose "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance."  W. Va. Code R. 42-8-8.11(a)-(c).

The plaintiff in this case falls under both the federal and state exemptions.  Price's job title at Region 4 was Fiscal Manager/Assistant Executive Director and before she was terminated, her salary exceeded $85,000.  As Fiscal Manager, Price was in charge of the company's auditing and periodic budgets.  Her deposition testimony confirms that she administered the payroll, administered Region 4's budget, performed human resources functions, kept financial records, and handled employee benefits relating to health, pension and insurance.  These responsibilities fall squarely within the "non-manual" work activities that qualify under the FLSA administrative exemption.  With respect to the Assistant Executive Director aspect of her job title, Price engaged in

"work directly related to the management" of the agency.  In fact, the plaintiff's resume indicates that her duties in this position included staff leadership, personnel administration, collaboration with the Executive Director, establishing staff priorities and deadlines, regulatory compliance, knowledge of policy and procedure, administration of project-related duties and tasks, management of personnel operations, overseeing financial requirements, and leadership.  Price clearly meets the $455.00/week threshold under the Code and not one of her job duties include those which could be considered "manual." Accordingly, "no reasonable jury could fail to find, by clear and convincing evidence, that the exemption applies" under both the FLSA and the West Virginia scheme.  __Gordon v. Rush Trucking Corp.__, 2016 WL 1047084, at *10 (S.D. W. Va. 2016) (citing __Anderson v. Liberty Lobby__, 477 U.S. 242, 255 (1986)).

2. Count II – Violation of W. Va. Wage Payment and Collection Act

        The plaintiff claims she is entitled to liquidated damages in an amount equal to three times unpaid wages under the WPCA, W. Va. Code § 21-5-4(e), because Region 4 failed to "timely pay [her] required overtime."  Compl. ¶ 45-46.  However, this provision specifically states: "This section regulates the timing of wage payments upon separation from employment and not

whether overtime pay is due. Liquidated damages that can be awarded under this section are not available to employees claiming they were misclassified as exempt from overtime under state and federal wage and hour laws." W. Va. Code § 21-5-4(e). "When a statute is clear and unambiguous and the legislative intent is plain, the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute . . . .'" State v. General Daniel Morgan Post No., 107 S.E.2d 353 (W. Va. 1959). Accordingly, Price has no cause of action under the WPCA.

3. Count III – Retaliation

Both parties seek summary judgment on the plaintiff's claim for retaliation, which she brings under the FLSA and West Virginia Human Rights Act ("WVHRA").

A. The FLSA

The antiretaliation provision of the FLSA, 29 U.S.C. § 215(a)(3), makes it unlawful for an employer "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding." Ball v. Memphis Bar-B-Q Co., 228 F.3d 360, 363 (4th Cir. 2000).

To establish a prima facie case of retaliation under the FLSA, a plaintiff must show that: (1) [s]he "engaged in an activity protected by the FLSA; (2) [s]he suffered adverse action by the employer subsequent to or contemporaneous with such protected activity; and (3) a causal connection exists between the employee's activity and the employer's adverse action." Darveau v. Detecon, Inc., 515 F.3d 334, 340 (4th Cir. 2008).

With respect to the first element, "protected activity" includes oral as well as written complaints of violation of the FLSA. Kasten v. Saint-Gobain Performance Plastics Corp., 563 U.S. 1, 1 (2011). As to the second element, a FLSA plaintiff must show "that [the] employer retaliated against h[er] by engaging in an action that would have been materially adverse to a reasonable employee because the employer's actions could well dissuade a reasonable worker from making or supporting a charge of discrimination." Id. at 343. With respect to the final element, "[t]he crucial inquiry is whether the decisionmaker had knowledge of the protected activity at the time of the adverse employment action." Swigert v. Broadway Servs., Inc., 2009 WL 2139711, at *10 (D. Md. 2009).

The plaintiff claims it is "undisputed" that defendants knew of the plaintiff's protected activity, inasmuch as they were aware of the complaints she made to them with

respect to Region 4's overtime policy.  These complaints include a conversation on June 18, 2013 with Smith, in which Price expressed her dissatisfaction with the agency's employment agreement which prohibited overtime compensation, and her request that the agency include her proposed addition of $50,000 in the budget for either overtime compensation or the hiring of new staff to avoid overtime, all of which she presented to the Budget committee at a budget meeting.  She claims these two factors, along  with the allegation that Region 4 placed "impossible restrictions" on her in the form of additional transitional duties during her ascension to Executive Director, Tuggle's refusal to give her a raise, the process by which she was required to seek medical leave, and her discharge from Region 4, establish a causal connection between her employer's knowledge and the alleged adverse action.

The court recognizes that Region 4 and Smith had knowledge of the plaintiff's protected activity relating to her complaints about failure to pay overtime.  Price proposed a solution to that very problem and the Budget committee promptly accepted Price's June 19, 2013 budget designating $50,000 for overtime payments or additional staff to avoid overtime, along with $15,000 for contract services to update the employee handbook.  The Executive Committee then approved the budget that

very same evening, thereby approving the proposal by Price to include overtime pay. There is no adequate basis on which to conclude that the Executive Committee acted adversely towards her as a result.

With respect to the second element, that she suffered adverse action, the only action that could be considered adverse was Region 4's justifiable decision to terminate Price. The court rejects the plaintiff's claims of adverse action based on her unsubstantiated contentions that (1) the Executive Committee subjected her to "impossible restrictions" upon appointing her as Executive Director and (2) "harassment" with respect to both obtaining FMLA leave and while on medical leave.

First, the court does not believe that, in a period of seventy-five days, from Price's promotion on April 17, 2013 to her resignation on July 1, 2013, her employer's expectation that she complete her everyday job duties while training an employee and familiarizing herself with her new role in the agency, is unduly restrictive. Price made little effort to meet these expectations and instead soon resigned after her promotion was ratified by the Executive Committee on April 17, 2013. The plaintiff argues she was treated unfairly because the Executive Committee did not hold Tuggle to the same standards. Tuggle, however, was not already working for the agency. Thus, he did

not, and could not, be expected to train an employee while maintaining other duties for Region 4 once hired. The court does not find that the interim impositions upon her constituted retaliation, but rather, concludes that her temporarily added work duties were reasonable expectations in light of the circumstances.

With respect to the January 2014 exchange between Price and Tuggle regarding her salary, it appears that Price was unhappy that unlike many of her coworkers, she did not receive a raise. Executive Director Tuggle confirmed that Price, whose salary was $85,315, misunderstood what he meant by the term "range" – and he added that she could qualify for a raise in the future, but at that time, her salary was fair. As the second highest paid employee at Region 4, it does not appear to the court that choosing to award other employees with a raise while neglecting to award one to Price was "retaliation," but rather, a reasonable business decision.

The plaintiff also theorizes that Tuggle changed the Region 4 work schedules to retaliate against her. However, a closer listening of the October 3, 2013 recording reveals legitimate justifications for Tuggle's decision to mandate a five-day workweek. For example, Smith pointed out that as the new director of Region 4, it was reasonable for Tuggle to desire

that staff be present five days per week while he became acclimated with the agency.  Smith mentioned that Price may be hurt by this change more than others; however, this was because Price began working shorter workweeks prior to the time when her coworkers began working non-traditional workweeks.  Tuggle's policy thus appears to have the purpose of affecting employees equally.  It was not, as the plaintiff contends, an attempt to harm her.

Second, nothing about the plaintiff's medical leave process appears to be adverse.  Price specifically requested FMLA forms for Family and Medical Leave.  In accordance with that request, Region 4 furnished necessary documents to be completed by her healthcare provider.  The completed forms contained ambiguities and numerous errors.  Thus, requesting the plaintiff to furnish revised forms was not retaliatory, but rather, expected and also required by the FMLA.  Further, mandating the plaintiff to return to work on December 8, 2014 in accordance with NP Moose's specification that she might be able to return on that date - unless she provided further documentation - was not adverse, inasmuch as she was granted additional leave until January 5, 2014 after completing the request.  Finally, asking an employee to complete a questionnaire about her leave and time records does not

constitute retaliation, and the plaintiffs have not cited to any case law establishing otherwise.

Regarding Price's contention that Region 4 hired a private investigator to improperly seek medical records from NP Moose, plaintiff provides only her own speculative deposition testimony, and testimony from Moose, who merely suspected that this was a private investigator calling on Region 4's behalf. There is simply no evidence to support this allegation.

Even if the court were of the opinion that the facts sufficiently supported a prima facie case for retaliation, which it does not, the defendants have asserted a legitimate, nondiscriminatory reason for its decision to terminate the plaintiff's employment. Thus, Price cannot prevail. Holland v. Wash. Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007). The defendants' burden to show a legitimate reason is not one of persuasion, but of production. Id. And it is "low such that it 'need not persuade the court that it was actually motivated by the proffered reasons' so long as it otherwise articulates a legitimate reason that is supported by the evidence." Robinson v. Affinia Group, Inc., 815 F. Supp. 2d 935, 943 (W.D. N.C. 2011) (quoting Tx. Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 (1981)).

The parties agree that the plaintiff's termination resulted at least in part from her decision to record office conversations from 2012 to 2014. While Price was on FMLA leave, it was discovered that she had made over 150 secret recordings of Region 4 administrators, staff members, and clients over a three-year period. <u>See</u> Defs.' Mot. Summ. J. at Ex. U. As the Discipline Documentation Form, which served as Price's termination letter, indicated, the recordings "planted a seed of distrust . . . which could [have] easily spread throughout the Region and State." Defendant Tuggle confirmed this in his deposition:

> [The decision to end Price's career at Region 4] would have been after she returned from her leave . . . with the advent of the recordings and all the stress that had created within the office and so forth, you know. I wanted to give her the chance to come back to work there to see how that would work out within our agency, and it just was evident that . . . she showed no remorse whatsoever for what she had done and, therefore . . . I could see that it would go nowhere and just decided that she would need to part ways. Her presence there would have been detrimental to our agency.

Defs.' Mot. Summ. J., Ex. T at 19. Because the evidence offered by the defendants supports Tuggle's justification, plaintiff's retaliation claim under the FLSA fails as a matter of law.

B. The WVHRA

With respect to Price's state law retaliation claim, the WVHRA requires a showing that: (1) the plaintiff "engaged in protected activity;" (2) the plaintiff's "employer was aware of the protected activities;" (3) the plaintiff "was subsequently discharged;" and (4) "(absent other evidence tending to establish a retaliatory motivation)" the plaintiff's "discharge followed her protected activities within such period of time that the court can infer retaliatory motivation." Frank's Shoe Store v. West Virginia Human Rights Comm'n, 365 S.E.2d 251, 259 (W. Va. 1986).

The plaintiff sets forth essentially the same grounds[3] in support of her state law retaliation claim as she does her

---

[3] The specific factual bases for the plaintiff's state law claim are: (1) Tuggle changing Price's work schedule stating: "It's going to hurt you more personally" (though the recording reveals otherwise); (2) Tuggle imposing a "salary cap" (though the recording reveals the term "range" was used) on Price while not imposing this on other employees; (3) furnishing the plaintiff FMLA Family and Medical Leave paperwork and mandating that she meet FMLA requirements for such leave "even though these restrictions have never been placed on anyone else;" (4) requiring Moose to "furnish detailed medical information, where this had never been required before" and "Manchester demanding clarification on the medical information provided;" (5) Tuggle demonstrating that FMLA process was a "charade" by allegedly withdrawing approval for FMLA leave; (6) subjecting Price to surveillance of a private investigator; (7) requiring Price to return to work on December 8, 2014 "even though she had not been released to return;" (8) the Executive Committee holding a special meeting to adopt a "new handbook" four days prior to Price's return to work; (9) Price "being forced" to sign the handbook before being discharged (while her deposition reveals that all employees were required to sign the handbook); (10) Tuggle requiring Price to complete the overtime "questionnaire;" (11) Price's discharge; and (12) Region 4's alleged failure to conduct inquiry into Price's complaints, but instead dismisses

FLSA claim.  As stated, the plaintiff engaged in protective activity when she made oral complaints to Smith about the agency's overtime policy and Region 4 was put on notice of those after it received a letter from her counsel in September 2014. However, her state law retaliation claim fails for the same reason as does her FLSA retaliation claim: a legitimate, nondiscriminatory reason breaks the causal chain of Region 4's knowledge of Price's complaints and her discharge from employment.  See Conrad, 480 S.E. 2d at 814.

4. Count IV – Intentional Infliction of Emotional Distress

To prevail on a claim for intentional or reckless infliction of emotional distress, the following elements must be established:

> (1) conduct by the defendant which is atrocious, utterly intolerable in a civilized community, and so extreme and outrageous as to exceed all possible bounds of decency; (2) the defendant acted with intent to inflict emotional distress or acted recklessly when it was certain or substantially certain such distress would result from his conduct; (3) the actions of the defendant caused the plaintiff to suffer emotional distress; and (4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

---

them "out of hand" (though she cites to nowhere in the record to support this claim).

<u>Travis v. Alcon Labs., Inc.</u>, 504 S.E.2d 419, 425 (1998). The defendant's actions "must be more than unreasonable, unkind or unfair; it must truly offend community notions of acceptable conduct." <u>Grandchamp v. United Air Lines, Inc.</u>, 854 F.2d 381, 383 (10th Cir. 1988).

The plaintiff claims that the defendant's actions toward her, "including but not limited to, accusing her of improperly manipulating her personal compensation, imposing unreasonable conditions upon her assumption of the position of Executive Director, refusing to allow her adequate time to transition into the position of Executive Director despite her repeated requests, repeatedly requiring her to submit additional medical information and requiring her to comply with unique procedures in order to obtain sick and annual leave to which she was entitled under law, and discharging her from employment were intended by Defendants to create and foster anxiety and severe emotional distress in the Plaintiff." Compl. ¶ 53. These accusations simply do not amount to the egregious conduct a plaintiff must allege to survive a motion for summary judgment.

As the court explained previously herein, the alleged restrictions placed on her promotion while transitioning were not unduly burdensome or restrictive. Further, the process of obtaining her medical leave complied with the FMLA. Moreover,

the plaintiff's claim in this respect is premised on her contention that it was unfair that no other employee was required to obtain, as was she, formal FMLA approval for her leave.  As stated, however, unfair treatment does not amount to intentional infliction of emotional distress.  Lastly, the plaintiff's termination was legitimate.  For these reasons, no reasonable jury could find that the plaintiff suffered intentional infliction of emotional distress.

5. Count V – Violation of Proposed Public Policy

Plaintiff also asserts a claim for wrongful termination under West Virginia law.  Although West Virginia is an at-will employment state and West Virginia law generally does not support a wrongful termination cause of action, a narrow exception exists when the termination occurs as a result of an employer's violation of public policy and there is no other avenue of relief.  See Harless v. First Nat. Bank in Fairmont, 246 S.E.2d 270 (W. Va. 1978).  "To identify the sources of public policy for purposes of determining whether a retaliatory discharge has occurred, [the court] look[s] to established precepts in our constitution, legislative enactments, legislatively approved regulations, and judicial opinions." Birthisel v. Tri-Cities Health Services Corp., 424 S.E.2d 606, 612 (1992).  Because no reasonable fact finder could find that

Price suffered adverse employment action aside from her discharge and because that discharge was lawful for the reasons already advanced in connection with Count III, the court concludes that summary judgment is also appropriate on the proposed public policy claim.

6. Count VI — Sex Discrimination & Sexual Harassment (Hostile Work Environment)

A. Title VII

1. Sex Discrimination

The defendants contend that Price failed to file a charge with the Equal Employment Opportunity Commission ("EEOC") and thus lost her ability to recover under Title VII. 42 U.S.C. § 2000e-5(e)(1). Under the Civil Rights Act, a plaintiff must file a charge with the EEOC within 180 days of the alleged discriminatory act to sue in federal court under Title VII or 300 days if the plaintiff initially instituted proceedings with a state or local agency with authority to grant or seek relief from the alleged discrimination. See id. There is no evidence to support that plaintiff timely filed a charge with the EEOC, and she is noticeably silent on the point in her responsive briefs. Not having filed with the EEOC, Price cannot seek remedy for her discrimination claim under Title VII. In the

unlikely event that Price did in fact file a charge, the court
will proceed with the merits of her claim.

Under Title VII of the Civil Rights Act of 1964, an
employer is not permitted "to discharge any individual, or
otherwise to discriminate against any individual with respect to
his compensation, terms, conditions, or privileges of
employment, because of such individual's race, color, religion,
sex, or national origin."  42 U.S.C. § 2000e-2.  There are two
ways in which a plaintiff "may avert summary judgment and
establish a claim" for sex discrimination under Title VII.  Hill
v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284-85
(4th Cir. 2004)(en banc), abrogated on other grounds by Univ. of
Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 388 (2013).  It can be
done by either (1) demonstrating through direct or
circumstantial evidence that sex discrimination "motivated the
employer's adverse employment decision" or (2) "under a
'pretext' framework, in which the employee, after establishing a
prima facie case of discrimination, demonstrates that the
employer's proffered permissible reason for taking an adverse
action is actually a pretext for discrimination."  Id.

Under Title VII, the plaintiff has pursued the second
avenue of proof.  A prima facie case of sex discrimination under
that framework requires a showing that "(1) she is a member of a

protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class."  Id. at 285.  If the plaintiff makes a sufficient showing, the burden of proof shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  Id.

Price asserts that Region 4 took adverse employment action against her by causing her to step down from the Executive Director position, yet she performed her job duties in accordance with the legitimate expectations of Region 4.  She alleges this conduct was motivated by sex discrimination. Specifically, she claims that having no prior record of discipline, receiving a recommendation from Smith to be promoted, and receiving regular salary increases evidences her qualifications.  She then asserts that although she voluntarily withdrew from the position, it was "fraught with obstacles and impediments" that caused her withdrawal.

As discussed previously herein, these alleged "obstacles" were not overly restrictive or preventative of Price's ability to successfully ascend into the position.  Nor

do those "obstacles," which were simply reasonable expectations, appear to have been motivated by discrimination. Further, the fact that she adhered to the agency's prior expectations as evidenced by her multiple salary raises, that Smith recommended her promotion, and that the Executive Committee approved her promotion rebuts her theory that Region 4 discriminated against her because of her sex. Price provides no evidence, aside from the accusation that "the Agency favored males in executive positions," and the fact that Region 4 hired a male to replace her once she resigned from the position, to support her contention. Compl. ¶ 61. As a matter of law, these asserted "facts" are simply insufficient to establish a case for discrimination. Moreover, it was Price who, within a couple of months or so, resigned from the Executive Directorship to which she was being promoted, and it was her choice to remain as Assistant Executive Director. The Executive Committee voted for her to assume the position of Executive Director – it was Price's choice and hers alone to not accept it. Accordingly, the plaintiff has failed to establish a prima facie case of discrimination.

Regardless, the defendants have set forth a legitimate reason for the plaintiff's discharge and her discrimination claim thus fails under federal and state law. The defendants

have stated that her "unprofessional, disrespectful, and inexcusable behavior" in making secret recordings of office conversations with "administrators, staff members, and clients" caused Tuggle to terminate her employment. See Defs.' Mot. Summ. J. at 7-8. The discharge form noted that the recordings revealed that Price "used profane language to [her] coworkers, disparaged individuals at Region 4, and by recording an outside professional without his knowledge, planted a seed of distrust of Region 4 which could easily spread throughout the Region and State." Id. at 8. The evidence roundly supports the actions of the defendants.

### 2. Sexual Harassment (Hostile Work Environment)

The sex-based statements made by Smith in this case, though derogatory, inappropriate, and offensive, are not, as a matter of law, sufficiently severe to substantiate a claim for sexual harassment. In order to establish a claim for hostile work environment based on sexual harassment, the plaintiff must show that the conduct "was sufficiently severe or pervasive to alter the conditions of" employment "and create an abusive work environment." Ziskie v. Mineta, 547 F.3d 220, 224 (4th Cir. 2008). The analysis is two-fold; the alleged occurrences must be both severe and frequent for Title VII purposes. See, e.g., Shields v. Fed. Exp. Cop., 120 Fed. Appx. 956, 961 (4th Cir.

2005); <u>EEOC v. Sunbelt Rentals, Inc.</u>, 521 F.3d 306, 315 (4th Cir. 2008). There exists a "high bar in order to satisfy the severe or pervasive test" to state a prima facie case of hostile work environment. <u>Sunbelt Rentals</u>, 521 F.3d at 315. Indeed, there must be a showing that "the environment was pervaded with discriminatory conduct aimed to humiliate, ridicule, or intimidate, thereby creating an abusive atmosphere." <u>E.E.O.C. v. Cent. Wholesalers, Inc.</u>, 573 F.3d 167, 176 (4th Cir. 2009) (internal quotations omitted). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." <u>Sunbelt Rentals</u>, 521 F.3d at 315 (internal quotations omitted). And mere "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." <u>Shields v. Fed. Express Corp.</u>, 120 Fed. Appx. 956, 961 (4th Cir. 2005).

Of the 150 recordings made over a two-year period, the plaintiff in this case cites only the five stated instances of inappropriate or unwelcomed sexual-related comments that were made in her presence. Moreover, it appears that only one of those recorded instances was invasive – where Smith told Price that he was "sitting here looking at you, pretending like you don't have any clothes on." This isolated statement in April

2012, whether alone or with his other listed comments, does not meet the numerosity requirement inasmuch as it does not appear that inappropriate comments were continuously or repetitively made to Price.  See Herbert v. Olympia Hotel Management LLC, 2014 WL 414227, at *4–5 (W.D. Va. 2014) (explaining that "precedent is very clear that incidents [of sexual harassment] must be numerous and continuous in order to be deemed severe and pervasive" and concluding that plaintiff could not show that the unwelcome conduct was sufficiently severe or pervasive to alter the plaintiff's conditions of employment where the plaintiff presented evidence of only one incident of harassment).  Nor do these comments rise to the level of severity and pervasiveness required to state a claim.  See Celetox, 477 U.S. at 322 (explaining that Rule 56(c) of the federal rules of civil procedure requires entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case).

B. The WVHRA

Turning to the plaintiff's sexual harassment claim under the WVHRA, Price must show that her employer's alleged conduct: (1) was unwelcome; (2) was based on her sex; (3) "was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment;" and (4) was

imputable to Region 4.  <u>Hanlon v. Chambers</u>, 464 S.E.2d 741, 748-49 (W. Va. 1995) (citing <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 20 (1993).  The test for establishing a sexual harassment under the West Virginia Human Rights Act is identical to that under Title VII.  <u>See id.</u>  "An employee may state a claim for hostile environment sexual harassment if unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature have the purpose or effect of unreasonably interfering with an individual's work performance or creates an intimidating, hostile, or offensive working environment."  Syl. pt. 7, <u>Hanlon v. Chambers</u>, 464 S.E.2d 741 (W. Va. 1995).  In order to determine whether the plaintiff should have survived a summary judgment motion, the court must determine whether Price has "adduced sufficient facts to create an inference that she experienced a hostile or abusive work environment because of actionable sexual harassment." <u>Conrad v. ARA Szabo</u>, 480 S.E.2d 801, 810 (W. Va. 1996).

The defendants correctly assert that the two-year statute of limitations applicable to claims made under the WVHRA warrants dismissal.  <u>See</u> <u>Metz v. Eastern Associated Coal, LLC</u>, 799 S.E.2d 707, 710 (2017).  The  statute of limitations for employment discrimination cases under this Act begins to run from the date the plaintiff first learns of the alleged act of

discrimination.  __Id.__  The dates on which the inappropriate, sex-based comments in question took place were April 19, 2012, April 23, 2012, June 25, 2012, June 26, 2012, and August 1, 2013. Accordingly, the plaintiff would have been required to file this action by August 1, 2015 in order to seek remedy under the WVHRA with respect to her sexual harassment allegations.  The plaintiff did not file the complaint in this case until February 12, 2016.  Accordingly, the WVHRA sex discrimination claim is barred.  Nonetheless, even addressing the WVHRA claim on the merits, it fails for the same reasons as do the Title VII claims on this same subject matter.

Accordingly, the court concludes that Price's Title VII and WVHRA claims based on sex discrimination and sexual harassment (hostile work environment) fail as a matter of law, and that the defendants are entitled to summary judgment on Count VI.

7. Count VII – Malice

Lastly, the plaintiff claims the defendants acted with malice and that she is thus entitled to an award of unmitigated back pay and front pay.  The defendants correctly assert, however, that the malice exception permitting front pay and back pay without need for mitigation has been abolished.  __See__ W. Va. Code §55-7E-3 ("In any employment law cause of action . . . the

plaintiff has an affirmative duty to mitigate past and future lost wages, regardless of whether the plaintiff can prove the defendant employer acted with malice.  The malice exception to the duty to mitigate damages is abolished.").[4]  Accordingly, the defendants are entitled to summary judgment on this count as well.

### IV. Conclusion

For the foregoing reasons, it is ORDERED that the plaintiff's motion for summary judgment be, and hereby is, denied and that the defendants' motion for summary judgment be, and hereby is, granted on all counts.

The Clerk is requested to transmit copies of this order to all counsel of record and any unrepresented parties.

ENTER: April 25, 2019

John T. Copenhaver, Jr.
Senior United States District Judge

---

[4] The West Supreme Court of Appeals resolved the issue of whether retroactive application of W. Va. Code §55-7E-3 is proper in this case, in which it held that the statute applies to claims arising before its enactment.  See Martinez v. Asplundh Tree Expert Co., 803 S.E.2d 582 (W. Va. 2017).  Indeed, this case was stayed for a time while awaiting the Martinez decision.